IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs September 25, 2019

## STATE OF TENNESSEE v. GARY STRANGE

**Appeal from the Criminal Court for Knox County**
**No. 108989   Bobby R. McGee, Judge**

———————————————————

## No. E2019-00016-CCA-R3-CD

———————————————————

Defendant, Gary Strange, was convicted of three counts of rape of a child and one count of incest following a jury trial. The trial court sentenced Defendant to thirty years for each count of rape of a child and eight years for incest. The trial court ordered two of the thirty-year sentences to run consecutively with each other and concurrently to the remaining sentences for an effective sixty-year sentence as a Range II offender. On appeal, Defendant contends that: (1) the trial court erred by admitting the victim's forensic interview; (2) the trial court erred by failing to require the State to make an election of offenses; (3) the evidence was insufficient to support his convictions; (4) there was a fatal variance between the indictment and the evidence; and (5) his sentence is excessive. After a thorough review of the briefs and the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mary L. Ward, Knoxville, Tennessee, for the appellant, Gary Strange.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Joanie Stewart and Nathaniel Ogle, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Background*

The twelve-year-old victim testified that Defendant is his father. He said that he began living with his maternal grandmother and step-grandfather, Wilma Sue and Reuben Strange, on Island Home Avenue at the age of four or five, after his mother passed away, and he lived with them until he was approximately nine years old. Reuben Strange is also Defendant's great-uncle. The victim testified that his brother (it is the policy of this court not to refer to minors by their name), and Defendant also lived there. The victim testified that he and his brother shared a bedroom with twin beds, and Defendant slept on the couch. However, he said that Defendant sometimes slept in the bed with the victim.

The victim testified that he remembered being interviewed in 2014, when he was in third grade, concerning allegations that Defendant "hurt [him] by doing something to [him] in the bed." He said that the interview was recorded, and he had viewed the video several times. The recording was then played for the jury. During the interview, the victim told Nicole Mullinax, a forensic interviewer for Child Help, that: "My dad done me wrong." He stated that Defendant "tore [him] up inside" by placing his "privates," which was "big," up in the victim's "bottom" causing a cut. The victim told Ms. Mullinax that this occurred "last month on a Friday" night, when he was nine years old. He said that he told Wilma Sue and Reuben Strange about it the following day. The victim told Ms. Mullinax that the abuse had not happened before. The victim said that Defendant was supposed to sleep on the couch; however, Wilma Sue and Reuben Strange fell asleep, and Defendant snuck into the victim's and the victim's brother's bedroom, slowly closed the door, and "done S-E-X." The victim described Defendant's actions in detail. He said that Defendant came into the bedroom, got into the bed with him, told him to scoot over, took his own pants and boxer shorts off, and turned off the television. The victim said that he was wearing jeans and a t-shirt. Defendant then instructed the victim to roll over, and the victim said that Defendant "put his germs on me," which meant that Defendant licked his finger and placed it inside the victim's "bottom." The victim told Ms. Mullinax that Defendant then placed his "privates" in the victim's bottom pushing it "all the way in and all the way out." The victim said that he tried to scream because it hurt but Defendant told him to stop screaming. He told Ms. Mullinax that Defendant began licking the victim's ears, rolled him over, and placed his "privates" in the victim's mouth. The victim said that it tasted "really, really nasty." He told Ms. Mullinax that Defendant said: "Did you know I'm doing sex to you?" The victim said that Defendant was wearing cologne, and he could smell Defendant's breath which smelled like "gross stuff." Defendant then pulled his pants up, told the victim to go to sleep, and he left the room. The victim told Ms. Mullinax that he later noticed that his bottom was red.

The victim acknowledged that in the video, he said that Defendant's "privates" went into the victim's "bottom." On a diagram, the victim indicated that Defendant's

- 2 -

"privates" was his penis. The victim agreed that he told his grandmother what Defendant did to him, and he wrote it out on a piece of paper at school after Christmas break. The victim testified that his grandparents were mad when they found out what happened. He thought that his grandmother also told his aunt "Lisa" about it. The victim testified that he saw a female nurse after the interview for an examination, and he also told her what Defendant did to him. The victim testified that the incidents he described in the video really happened and that Defendant's privates and finger went inside his "butt" more than once and that Defendant's privates went into his mouth more than once. The victim stated that the incident he described in the forensic interview was the first time that it happened. He acknowledged that he could not recall the exact date of the incident but that it occurred over Christmas break.

On cross-examination, the victim testified that Defendant always slept on the couch at Wilma Sue and Reuben Strange's residence except for when he came into the victim's room "the time I was talking about in the video . . . and the other few times that he did it to me." The victim admitted that he wrote on one of his school assignments: "He had sex with me, don't tell nobody. I need help. Someone please could you help me." The victim confirmed that the note referred to Defendant. He thought that his teacher wrote the date of February 6, 2014, on the paper. He could not recall exactly when he wrote the note. The victim testified that he had told Wilma Sue Strange about the abuse before he wrote the note. He said that he told Wilma Sue and Reuben Strange what happened the day after Defendant raped him, and he had scrapes on his bottom after the rape. He said that Defendant was told to leave the house after he told Wilma Sue Strange what happened but Defendant returned. The victim noted that on one occasion when a caseworker visited the house, Defendant hid in the closet. On another occasion, the caseworker showed up at the house while Defendant was unloading groceries from the car. The victim testified that Defendant had driven the car earlier, and the victim rode in the back seat. Wilma Sue Strange and the victim's great-grandmother, Ruby Strange, were also in the car. The victim was immediately removed from the home and placed into foster care. The victim testified that Defendant touched him more than one time, even though he stated in the interview that it occurred only once.

Allison King testified that in 2014 she worked at Dogwood Elementary School as a "student and family support coordinator[.]" She said that her job was similar to that of a counselor and social worker. In 2014, Ms. King learned of a letter that the victim had written. Both the victim and the letter were brought to her office on February 6, 2014. Ms. King testified that the victim was very calm when he walked into her office. She said: "[The victim] is very - - always pretty calm, since I had known him when he was - - since he was five, was very matter of fact, didn't really say much, just handed - -you know, like I said, he gave me the letter." Ms. King testified that she wrote the date of February 6, 2014, on the letter.

Detective Deborah Nuchols of the Knoxville Police Department, special crimes unit, testified that she was given a referral on January 10, 2014, to open an investigation concerning Defendant and the victim. Detective Nuchols had spoken with the Department of Children's Services (DCS) case manager Travis Bishop for information about the case. She noted that the victim's case was a "priority 2" case because the victim's grandmother was reported to have "been being protective of him," which meant that the case did not need an immediate response but required a response within seventy-two hours. Detective Nuchols explained that the victim's grandmother had indicated that she was going to make sure that the victim would not have contact with Defendant. However, that was not the case, and the victim was placed in foster care.

Detective Nuchols testified that a "Child Help interview" was scheduled with the victim at the Child Advocacy Center on February 5, 2014. Detective Nuchols and Todd Bishop observed the interview through a two-way mirror. Detective Nuchols testified that the victim disclosed what happened to him and identified Defendant as the person who harmed him. Detective Nuchols then met with Defendant. She testified:

> He tended to be unable to stay on point when asked a question. He deflected it to other people, as opposed to answering the question. He admitted to a lot of the same things that [the victim] had, except he wouldn't go to a specific point.

Detective Nuchols testified that Defendant denied the allegations of sexual abuse against the victim.

Travis Keith Bishop was working for DCS as an investigator in Knox County at the time of the present offenses. In January of 2014, he received a referral concerning the victim through the "Nashville Hotline." Mr. Bishop noted that the victim's case was considered a "priority 3" case, which required a response within three business days. He went to home of the victim's grandparents to initially speak with the victim. The ten-year-old victim, Reuben Strange, Wilma Sue Strange and the victim's brother were present at the time. Mr. Bishop testified that Wilma Sue and Reuben Strange had gained custody of the victim and his brother from Defendant through an involuntary transfer in juvenile court on April 6, 2009. Mr. Bishop noted that Wilma Sue Strange was very immobile, and Reuben Strange was elderly, very passive, and seemed to be "on the slow spectrum." He said that the victim was very mature for his age and acted in an adult manner. Mr. Bishop felt that the victim's maturity was "way more than a child of that level should know." He then scheduled an interview for the victim at Child Help of Knox County. At trial, the parties made the following stipulation:

> [F]rom the date of Travis Bishop's involvement, when he made contact with Wilma Sue and Reuben Strange, that there was an agreement they, as the custodians of [the victim], would not allow [the victim] to have

access to [Defendant] - - or vice-versa, to have [Defendant] allow - - be allowed to have access to [the victim].

Mr. Bishop testified that he arranged for the victim, Reuben Strange, and the victim's brother to be transported to Child Help for an interview on February 5, 2014. Detective Nuchols was also present for the interview. Mr. Bishop acknowledged that he had received multiple referrals of harm against the victim. He said: "The first was January 10th, the next was January 14th, the next was January 27th. I think there was two that came - - two came in on the same day, on January 30th, February 6th, and April 1st and May 1st." All of the referrals were incorporated into his investigation. Mr. Bishop noted that the referrals were from multiple individuals and involved different allegations.

Mr. Bishop testified that he talked to Wilma Sue and Reuben Strange on multiple occasions. He also spoke with the victim's case manager at the Helen Ross McNabb Center, neighbors, the victim's teachers, and the victim's previous case manager. Mr. Bishop did not obtain any information that would have led him to a different suspect. He noted that he scheduled the victim for a medical examination after the forensic interview was completed. Mr. Bishop made an unannounced visit to Wilma Sue and Reuben Strange's house on March 20, 2014. He did not find Defendant at the residence. He went to the house unannounced again on April 1, 2014, because there had been a "priority 1 referral stating that [Defendant] was living in the home." He said that Wilma Sue Strange was on the couch, and Reuben Strange, the victim, and the victim's brother were at a therapy appointment at the Helen Ross McNabb Center. Mr. Bishop testified he did not feel comfortable about the situation when he left the home so he spoke with a neighbor. He saw a car pull in with Defendant, Reuben Strange, the victim, Ruby Strange, and the victim's brother inside. The victim got out of the car, was looking at the ground, and walked inside the house. Mr. Bishop immediately called the DCS legal staff to order a removal of the victim and his brother from the home. Mr. Bishop testified that Defendant appeared to be shocked that Mr. Bishop was there. Mr. Bishop added that Defendant said he "just got through taking the kid to the Helen Ross McNabb appointments. He knew he wasn't supposed to be around them, but he had to, because they had to get to their appointment and he was going to call me later that day." Mr. Bishop testified that he was present the following day on April 2, 2014, when Defendant met with Detective Nuchols. Defendant denied allegations that he had raped the victim. Mr. Bishop said that the victim and his brother were moved to foster care.

Gail Clift, a pediatric nurse practitioner, testified as an expert in "adolescent and pediatric sexual assault nurse examination." She examined the victim on April 10, 2014. He told her that Defendant had touched his "private parts," which Ms. Clift understood to be the victim's penis. The victim said that the touching occurred at his grandmother's house at night, and it happened more than one time. He also said that Defendant threatened to "whoop" him if he told anyone what happened.

Ms. Clift testified that she examined the victim's anal area and found "two areas that were fissures, laceration-type areas [.]" She noted that "[a] fissure is like a small tear. And they can be really small or they can be deeper. Deeper fissures are like a cut or like a laceration, I guess, is the medical term." Ms. Clift testified that one of the fissures was approximately two inches in length and was very deep. The second fissure was "an inch or less" and not as deep as the first one. She said that fissures are commonly caused by injury or constipation. Ms. Clift testified that the victim denied any problems with constipation. She said that the larger of the victim's anal fissures could have been consistent with sexual assault. Ms. Clift noted that it would have been unusual for the fissure to have been caused by constipation because it was a "little bit more removed from the anal opening," and it was "more extended out toward the butt cheek[.]" Ms. Clift testified that the injuries to the victim's anus were more recent. She said that a small tear or fissure in a child "would probably heal in less than a week, most of the time." She agreed that if the area was re-injured, the time for the healing process would be extended. Ms. Clift testified that there could be penetration to the anus with no injury.

On cross-examination, Ms. Clift testified that the victim did not mention to her any anal penetration or oral sex by Defendant. She said that the victim's larger anal fissure probably occurred within two weeks prior to her examination of him. She did not feel the victim's anal injuries that she observed on April 10, 2014, occurred in December 2013 or January 2014.

At trial, the parties stipulated that the victim was seen for chest pain and lower abdominal pain on January 30, 2014, at the emergency room of the Physician's Regional Medical Center by Dr. Marwin Martinez. At that time, no sexual assault exam was conducted. The report from the examination contains the following "Impression" by Dr. Martinez: "Colonic gas pattern suggestive of fecal statis/constipation. Exam otherwise negative." The victim was prescribed Miralax, and Dr. Martinez made a referral to DCS. It was noted on the victim's discharge summary that "child says he was 'molested' by father 1 month ago. Child now staying [with] grandfather and he is safe. CPS has been called."

**Defendant's Proof**

Steven Strange, Defendant's brother, testified that he and the victim had a very close relationship, and he loved the victim like his own child. Steven Strange noted that he has a learning disability and trouble comprehending, and he is on disability. He lived with Wilma Sue and Reuben Strange in the home on Island Home Avenue from August 2013 until December 2013. Steven Strange testified that he slept in a recliner in the living room approximately ten feet from the bedroom where the victim and the victim's brother slept. He said that Defendant was also living in the residence at the time, and he slept in the bedroom with the victim and the victim's brother because the victim had nightmares. Steven Strange testified that he never saw Defendant hurt or threaten the

victim or his brother, and he never saw any indication that the victim was being sexually abused by anyone. He said that he never heard the victim or anyone else scream out at night. Steven Strange testified that he would have been able to hear sounds from the bedroom while he was in the recliner.

Steven Strange testified that Wilma Sue Strange, who was deceased at the time of trial, abused her Percocet prescription. He noted that she used a month's prescription, 120 Percocet pills, in two weeks. Steven Strange testified that Wilma Sue Strange conducted a drug deal in the living room with her downstairs neighbor each time that she ran out of Percocet, which occurred numerous times. He said that Wilma Sue Strange also had a prescription for Valium, which she sometimes sold to make money to buy Percocet or "roxies." Steven Strange testified that he listened to a voicemail that Wilma Sue Strange left on Defendant's phone sometime in November or December 2013. He said: "She stated that [Defendant] will regret messing with her; that this is - - that she will make his life a living hell and that he will never see his kids ever again and he will be in jail for a very long time."

Steven Strange testified that he confronted Wilma Sue Strange and asked why she allowed Defendant to stay at her house after he had been accused of sexual abuse. He said: "So what she told me is that she was not in her right mind, that she was not on medication, (inaudible), and that she said this because she was not in her right mind. And she said, I'm sorry, I didn't mean it." Steven Strange testified that he saw the victim on April 1, 2014, when Defendant brought the victim to the Helen Ross McNabb Center. Reuben Strange, Ruby Strange, and the victim's brother were also present. Defendant was in the driver's seat of the car. Steven Strange testified that the victim did not seem fearful of Defendant at the time, and he got into the car willingly. He noted that one time prior to April 1, 2014, after Steven Strange had moved out of the Island Home Avenue residence, Defendant brought the victim and the victim's brother to see Steven Strange.

On cross-examination, Steven Strange testified that Defendant slept in the bed with the victim because the victim had "really bad nightmares and would always dream about momma." He said that the victim had nightmares "[a]lmost every other night." Steven Strange testified that he slept in the Island Home Avenue residence every night from August 2013 until December 2013, except for three nights that Wilma Sue Strange "kicked" him out. Steven Strange indicated that he would have known if the victim was being sexually abused and that the victim would not have been able to hide it from him "because he's a kid." He said: "[The victim] don't know that he's hiding it intentionally, because it's something that happened to him. If that happened to him, he's going to be showing signs and not even realize he's showing them." Steven Strange testified that the victim had some anger problems, stomach problems, and he wet the bed. He said that he had heard the victim "wake up screaming," and Defendant comforted the victim by saying, "it's okay" and "[i]t's not real. I'm right here with you." Steven Strange admitted that he "self-medicated" by smoking marijuana. He told Detective Nuchols that

he smoked marijuana on a daily basis. Steven Strange testified that he and Defendant discussed the allegations against Defendant, and Steven Strange did not believe that Defendant committed the offenses. He said that he loved Defendant and that his (Steven Strange) trial testimony was truthful.

Steven Strange testified that the victim usually talked to him when something was wrong, and the victim never discussed the allegations with him. He said that he would have been able to tell if something was wrong with the victim and would have asked him about it. Steven Strange was aware that the victim had disclosed in great detail how Defendant anally penetrated him. However, Steven Strange did not know "what kind of detail."

Defendant testified that he has a learning disability and receives government assistance in the form of "SSI." Defendant testified that after his release from jail in 2011-12 on unrelated charges, he went to live with his grandmother, Ruby Strange, in Lenior City. He lived with Ruby Strange for approximately six months and then lived with Reuben and Wilma Sue Strange. He said that he went "back and forth" living with Ruby Strange and Reuben and Wilma Sue Strange. He did not have custody of the victim and the victim's brother at the time and worked in landscaping with his uncle. Defendant testified that Wilma Sue Strange had a broken arm, a "bad back" and "bad knees," and she was overweight. He said that she took several prescription medications including Percocet 10s, Valium, and Xanax.

Defendant testified that he bought pain pills for Wilma Sue Strange when she ran out because that was the only way she would allow him to see the victim and the victim's brother. He said that he knew buying the pills was illegal, and he estimated that he bought pills approximately twenty times for Wilma Sue Strange from three different people. Defendant testified that Wilma Sue Strange also purchased pain pills from her neighbor downstairs. He said that he stopped buying pain pills for Wilma Sue Strange in November 2013 because it was putting him in a financial bind. Defendant testified that Wilma Sue Strange then called him and left a voicemail stating that he would "pay dearly" and be in jail for the rest of his life. He said that Steven Strange also listened to the voicemail. On cross-examination, Defendant testified that he did not sleep in the bed with the victim again after listening to the voicemail. He said that Wilma Sue Strange also threatened to take away his rights to the victim and the victim's brother if he did not buy her more pain medication.

Defendant testified that although he took the victim to the Helen Ross McNabb Center, he did not go inside because he was not supposed to be around the victim. He said that Reuben Strange went inside with the victim. Defendant testified that the victim went to the Helen Ross McNabb Center for anger issues. He said that the victim would slam the door, throw things, and kick when he was angry. He also said that the victim had lied to him about homework, and the victim lied to Wilma Sue and Reuben Strange.

- 8 -

Defendant testified that the victim was always truthful to Steven Strange, and they had a good relationship. Defendant testified that he was nervous when Travis Bishop caught him with the victim on April 1, 2014, because he knew that he had violated the no contact order. Defendant testified that he never hid in the closet or anywhere else when Mr. Bishop previously visited the residence on Island Home Avenue.

Defendant testified that he slept on the couch or in the bed with the victim or the victim's brother. He said that he slept in the bed with the victim because the victim had nightmares about his mother's death and that the victim sometimes called him into the bedroom after waking from a nightmare. Defendant testified that he either fell asleep in the victim's bed afterwards or he went back to the couch after the victim fell asleep. Defendant testified that the nightmares occurred once or twice a week. He said that the victim always slept in blue jeans and a shirt. Defendant testified that he never touched the victim's penis, other than when bathing him. He said that he had to give the victim a suppository every other day for constipation because the victim ate spicy food or cheese, which he was not supposed eat. Defendant testified that he never inserted his penis into the victim's rectum or mouth, and he only inserted his finger into the victim's rectum to insert the suppository. He said that the victim had surgery one time on his bladder. Defendant denied ever sexually abusing the victim. Defendant admitted that he returned to Wilma Sue and Reuben Strange's residence after he was ordered to have no contact with the victim, and he saw the victim numerous times and took him places. He said that he was last "caught" with the victim on April 1, 2014.

On cross-examination, Defendant testified that the victim's mother died in 2008, and Wilma Sue and Reuben Strange were awarded custody of the victim and his brother in April 2009. Defendant was allowed supervised visits with the children every first and third Saturday of the month. Wilma Sue and Reuben Strange were allowed to give Defendant additional supervised visitation with the children. Defendant testified that he had a good relationship with the victim and the victim's brother, and he eventually moved into the house with Wilma Sue and Reuben Strange. Defendant agreed that he was convicted of felony evading arrest in Union County on November 30, 2009, and was sentenced to probation. He testified that also pled guilty to felony evading arrest on January 19, 2010, in Claiborne County, and he received a two-year sentence to be served in confinement. He said that he worked in landscaping for his uncle prior to his arrest, earning approximately $400 to $500 per week. Defendant admitted that he worked "under the table" and did not pay taxes on his wages so that his SSI benefits would not be affected. Defendant admitted that he attempted to talk to the victim about the allegations against Defendant after January 10, 2014. Defendant also admitted that he took the victim to the Helen Ross McNabb Center and waited outside because he knew that they would report him to authorities for being with the victim. He said that his driver's license was revoked at the time that he drove the victim to the center and other times that he drove the victim around.

*Analysis*

## I.    Whether the Trial Court Erred by Admitting the Victim's Forensic Interview

Defendant argues that the trial court erred by admitting the victim's forensic interview with Nicole Mullinax as substantive evidence "because the statute is unconstitutional," and the trial court failed to make the requisite findings. However, as pointed out by the State, Defendant has waived this issue. The record indicates that sometime before trial, the trial court held that the forensic interview would be admissible. The following exchange took place at trial:

> [Prosecutor]:      Your Honor, [trial counsel] and I have worked extensively to try to flesh out some pretrial issues. That would include, there's two separate exhibits that the State has been working with defense counsel on. One would obviously be the forensic interview of the child. Your Honor has previously ruled that that would be admissible in this case so long as it could be authenticated by the child. We have redacted out a few areas within that forensic interview that made references to marijuana - -
>
> [Defense counsel]:      His history, criminal history.
>
> [Prosecutor]:      - - his criminal history and those types of things. We've provided - - we've agreed upon the times that need to be redacted and we've provided clean copies. So I will enter a complete video for ID only, and then, of course, the redacted copy will be the one that will be played.
>
> I also have it on my computer, so what I would ask is to not - - to just have the disk identified. And it's the same video that's on my computer, if I can just play it from there without having to load the disk so nothing crashes?
>
> THE COURT:      Any objections?
>
> [Defense counsel]:      No, that's fine.
>
> [Prosecutor]:      Okay.
>
> [Defense counsel]:      I mean, we've agreed, Your Honor - - I think that we - - as far as we are - - she and I are concerned, unless we both

miss something, it should be everything that needed to be redacted has been redacted, so . . .

[Prosecutor]:          Yes, Your Honor.

[Defense counsel]:          That's fine.  However she wants to play it - -

[Prosecutor]:      Okay.

[Trial counsel]:      - - I don't care, honestly.

There is nothing else in the record concerning the trial court's ruling on this issue. There is no transcript of any hearing or a written order.  Appellant bears the responsibility of preparing a record that sufficiently "convey[s] a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."  Tenn. R. App. P. 24.   Because appellant failed to include the  relevant transcripts and  documents,  we presume  the  trial court's findings  are  correct.  *See State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993); *State v. Ody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Therefore, this issue is waived.

We also note, as argued by the State, that Defendant has also waived this issue by failing to provide an adequate appellate brief.  Rule 27(a)(6), (7) of the Tennessee Rules of Appellate Procedure states in part that an appellant's brief shall contain the following:

(6) A statement of the facts, setting forth the facts relevant to the issues presented for review with appropriate reference to the record;

(7) An argument, which may be preceded by a summary of argument, setting forth:

(A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on; and

(B) for each issue, a concise statement of the applicable standard of review (which may appear in the discussion of the issue or under a separate heading placed before the discussion of the issues)[.]

Tenn. R. App. P. 27(a)(6), (7)(A)-(B).   Under Rule 10(b) of the Rules of the Court of Criminal Appeals, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this Court."  Defendant's

argument as to this issue does not contain any references to the record or relevant authority supporting his claim. Defendant asserts that the trial court failed to make specific findings of fact, as required in T.C.A. § 24-7-123(d). As stated above, it appears from the record that there was a hearing concerning this issue, but the transcript was not included in the record on appeal. Defendant cited a statute, but without a transcript or written order, Defendant failed to cite to the appellate record. Defendant also asserts that the forensic interview statute is unconstitutional; but he does not provide any argument concerning the claim. Therefore, Defendant has waived all assertions challenging admissibility of the forensic interview.

## II. Whether the Trial Court Erred by Failing to Require the State To Make an Election of Offenses

Defendant argues that "the trial court committed plain error when it failed to require the State to make an election of offenses and failed to instruct the jury properly on the issue of election." We disagree.

Tennessee courts have repeatedly held that the State must elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See*, *e.g.*, *State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *State v. Shelton*, 851 S.W.2d 134, 136 (Tenn. 1993); *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). The election requirement arises most often when a defendant is alleged to have performed multiple sexual acts over a lengthy period of time against young children who are unable to provide the exact date on which any one act occurred. *See*, *e.g.*, *State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001); *Brown*, 992 S.W.2d 389, 391-92 (Tenn. 1999). "Any description that will identify the prosecuted offense for the jury is sufficient. In fulfilling its obligation . . . to ensure that an election occurs, the trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence." *Shelton*, 851 S.W.2d at 138 (internal citations and footnote omitted). The prosecutor need not identify a specific date but may "identify a particular type of abuse and elect that offense if the victim suffered multiple types of abuse" or may ask the child victim "to describe unique surroundings or circumstances that help to identify an incident." *State v. Knowles*, 470 S.W.3d 416, 424 (Tenn. 2015).

Contrary to Defendant's assertions in his brief, the record shows that the State made an election of offenses, and the trial court instructed the jury on election of offenses. In a side-bar, the prosecutor told the trial court the following concerning the election of offenses:

[Prosecutor]:  And what I would say, Your Honor, is yesterday, we made an election, pursuant to Burlison [v. State, 501 S.W.2d 801 (Tenn. 1973)] as to the acts that would have been described in the video.  So the jury will be instructed as to the election of offenses with the basic language that the proof, as the State asserts, that this occurred on more than one occasion, and these are the particular incidents which go up - - prior - - up to the date of the first [referral], is what we had elected, for three types of penetration.  But we can still go into - - because they have questioned the victim's credibility - - any reason that the story may have changed.

At the close of proof, the following exchange also took place:

THE COURT:    Does the State know of anything that you-all are going to ask of special instructions?

[Prosecutor]:    Not at this time, Your Honor.  We had prepared in writing our election, so . . .

THE COURT:    Okay.

[Prosecutor]:    Beth already has that, but . . .

[Defense counsel]:    She had that?  Okay.

THE COURT:    And when do you present the - - in your final argument?

[Prosecutor]:    Yes, Your Honor, it's in the jury instruction, specifically what the election is - -

THE COURT:    Oh, okay.

[Prosecutor]:    - - as to each count.

The transcript of the instructions read to the jury by the trial court is not in the record.  As already stated, Defendant is responsible to make sure the record reflects what transpired in the trial court.  A written copy of the jury instructions was made an exhibit for identification and is in the appellate record.  Whenever a defendant challenges any portion of the jury instructions, the defendant should make sure a transcript of the instructions as they were read to the jury is included in the record, or the issue likely will be waived.  *See* Tenn. R. App. P. 24(b); *State v. Jones*, 623 S.W.2d 129 (Tenn. Crim. App. 1981; *State v. Jermaine Nelson Buford*, No. M2019-00402-CCA-R3-CD, 2020 WL

- 13 -

414558, at *9-10. However, the only thing related to the issue is the written copy of the instructions, and it contradicts entirely what Defendant argues on this issue. The following is contained therein:

> The State has offered proof in its case in chief of more than one act allegedly committed by the defendant which the state alleges constitutes an element of the offense of Rape of a Child as charged in Counts 1, 2 and 3 and Incest as charged in Count 4 of the indictment. To ensure a unanimous verdict, the law requires the state to elect which alleged act testified to, the state is relying upon for your consideration in deciding whether or not the defendant is guilty of this offense or any lesser included offense. The fact that the court has required the state to elect does not mean that the court has found that the state has carried its burden of proving those allegations beyond a reasonable doubt; that is for your determination.

> In Count One – the State elects an act of digital penetration occurring where [Defendant] placed his finger in the anal opening of [the victim], prior to the first Department of Children's Services referral of January 10, 2014, while [the victim] was in third grade.

> Members of the jury, you are to consider only this alleged act in deciding whether or not the defendant has been proven guilty beyond a reasonable doubt of the offense charged and included in Count 1.

> In Count Two – the State elects an act of anal penetration wherein [Defendant] placed his penis in the anal opening of [the victim], prior to the first Department of Children's Services referral of January 10, 2014, while [the victim] was in the third grade.

> Members of the jury, you are to consider only this alleged act in deciding whether or not the defendant has been proven guilty beyond a reasonable doubt of the offense charged and included in Count 2.

> In Count Three – the State elects an act of oral penetration, to-wit: fellatio, wherein [Defendant] placed his penis in the mouth of [the victim], prior to the first Department of Children's Services referral of January 10, 2014, while [the victim] was in the third grade.

> Members of the jury, you are to consider only this alleged act in deciding whether or not the defendant has been proven guilty beyond a reasonable doubt of the offenses charged and included in Count 3.

- 14 -

In Count Four – the State elects an act of digital penetration wherein [Defendant] placed his finger in the anal opening of [the victim], prior to the first Department of Children's Services referral of January 10, 2014, while [the victim] was in the third grade.

Members of the jury, you are to consider only this alleged act in deciding whether or not the defendant has been proved guilty beyond a reasonable doubt of the offense charged and included Count 4.

The record implicitly approved by Defendant indicates the State made proper elections, and the trial court properly instructed the jury. Therefore, Defendant has not established plain error, and he is not entitled to relief on this issue.

## III. Whether the Evidence Was Sufficient to Support Defendant's Convictions

Defendant contends that the evidence was insufficient to support his convictions for rape of a child and incest. More specifically, he asserts that the "testimony of the victim was inconsistent and he gave varying accounts of the details." Defendant also states: "It is Defendant's position that the evidence was contradictory throughout the testimony and was insufficient to sustain a conviction."

The evidence presented at trial was sufficient to support Defendant's convictions. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

- 15 -

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

Defendant was convicted of rape of a child and incest. In order to sustain a conviction of rape of a child, the State was required to prove beyond a reasonable doubt that (1) the Defendant unlawfully sexually penetrated the victim, (2) who was less than thirteen years old, and that (3) the Defendant acted intentionally, knowingly, or recklessly. T.C.A. § 39-13-522. Sexual penetration is defined, in relevant part, as "sexual intercourse, . . . fellatio, [or] anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7). Incest, as relevant here, is established by proving beyond a reasonable doubt that the Defendant engaged in sexual penetration as defined in section 39-13-501, with the victim, and knowing the victim is Defendant's natural child. T.C.A. § 39-15-302.

It is undisputed in the evidence that Defendant is the victim's natural father. Taken in the light most favorable to the State, the proof at trial established that during his forensic interview, the victim disclosed to Ms. Mullinax that Defendant licked his finger and placed it inside the victim's bottom. He said that the Defendant then placed his "privates" in the victim's bottom pushing it "all the way in and all the way out." The victim told Ms. Mullinax that Defendant began licking the victim's ears, rolled him over,

and placed his "privates" in the victim's mouth, which the victim said tasted "really, really, nasty." The victim told Ms. Mullinax that Defendant said: "So you know I'm doing sex to you?" At trial, the victim testified that the events he described in the forensic interview actually happened and that Defendant committed the acts. He also explained that Defendant's "privates" meant Defendant's penis. The victim testified that he was nine years old when this happened. In addition to telling his grandparents that Defendant raped him, he also wrote it out on piece of paper at school. The victim admitted that he wrote on one of his school assignments: "He had sex with me, don't tell nobody. I need help. Someone please could you help me." The victim confirmed that the note referred to Defendant.

We conclude that the evidence is sufficient beyond a reasonable doubt to support Defendant's convictions for rape of a child and incest. To the extent that there were some inconsistencies in the victim's accounts of the offenses, the jury resolved those inconsistencies in favor of the State, as was its prerogative. *See State v. Elkins*, 102 S.W.3d, 582-83 (Tenn. 2003) (evidence was sufficient to support conviction for rape of child, despite fact that victim's testimony contained some inconsistencies); *Byrge v. State*, 575 S.W.2d 185, 191 (Tenn. 1992) ("The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact"). Defendant is not entitled to relief on this issue.

### IV. Whether There was a Fatal Variance Between the Indictment and the Evidence.

Defendant argues that there was a fatal variance between the indictment and the evidence presented by the State at trial. He asserts that the indictment limited the acts to a period of time between September 2012 and January 10, 2014, and that Gail Clift, the nurse practitioner, testified the victim suffered an injury after January 2014. Defendant further argues that Ms. Clift's testimony suggested "that criminal acts were committed following the violation of the no contact order," and the "fact that the proof was different than the [indictment] alleged subjects him to double jeopardy and makes it impossible to defend because it is unclear as to which acts he is in fact being accused." We disagree.

An accused is constitutionally guaranteed the right to be informed of the nature and cause of the accusation. U.S. Const. amend. VI, XIV; Tenn. Const. art. I, § 9; *see Wyatt v. State*, 24 S.W.3d 319, 324 (Tenn. 2000). Our courts have interpreted this constitutional mandate to require an indictment to "1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy." *Wyatt*, 24 S.W.3d at 324 (citations omitted). Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of

common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." T.C.A. § 40-13-202. The question of the validity of an indictment is one of law and, as such, our review is *de novo*. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

"A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984)). A variance is not material when substantial correspondence exists between the proof and the indictment. *Shropshire*, 45 S.W.3d at 71. When the indictment and the proof substantially correspond, the Defendant is not misled or surprised at trial, and there is protection against a second prosecution for the same offense, the variance is not considered material. *Moss*, 662 S.W.2d at 592. It is not reversible error when a defendant is sufficiently aware of the charge and is able to adequately prepare for trial. *Id.*

Tennessee Code Annotated section 40-13-207 provides that "[t]he time at which the offense was committed need not be stated in the indictment, . . . unless the time is a material ingredient in the offense." In *State v. Byrd*, 820 S.W.2d 739 (Tenn.1991), our supreme court held, "[t]he rule of law is well-established in Tennessee that the exact date, or even the year, of an offense need not be stated in the indictment or presentment unless the date or time 'is a material ingredient in the offense.'" *Id.* at 740 (quoting T.C.A. § 40-13-207). "In fact, in order to establish the legal sufficiency of that charging instrument, the State need only allege that the offense was committed prior to the finding of the indictment or presentment." *Id.*

Defendant has not shown that any variance between the indictment and the evidence presented at trial was both material and prejudicial. There was no question that the victim in this case was under the age of thirteen. The indictment alleged that the offenses were committed between September 2012 and January 10, 2014. Defendant complains that the State presented proof suggesting criminal acts by Defendant that occurred outside of that time frame. However, other than proving the victim's age at the time of the offense, the date of the offense is not a "material ingredient" of the offenses of rape of a child and incest. T.C.A. §§ 39-13-522(a), 39-15-302(a)(1); See *State v. Jeff Carter*, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212, at *17(Tenn. Crim. App. Dec. 16, 2010) ("Beyond proving the victim's age at the time of the offense, time is not a material ingredient in aggravated sexual battery, the offense for which the Defendant was convicted"); *State v. Ricky Lamont Brigman*, No. M2002-00461-CCA-R3-CD, 2003 WL 21391762, at *5 (Tenn. Crim. App. June 17, 2003) (No material variance in the indictment charging Defendant with attempted rape of a child when the indictment placed the victim's age at eleven at the time of the offense but the victim testified that events occurred when he was ten). In *State v. West*, 737 S.W.2d 790, 792 (Tenn. 1987) the Tennessee Supreme Court stated:

> The rule is that the offense must be proved to have been committed prior to the finding of the indictment and within the time specified by any applicable statute of limitations; and, except where a special date is essential or time is of the essence of the offense, the time of the commission of the offense averred in the indictment is not material and proof is not confined to the time charged. *Prince v. State*, 529 S.W.2d 729 (Tenn. Crim. App. 1975) and cases cited therein.

Therefore, Ms. Clift's testimony that she observed two fissures or tears to the victim's bottom when she examined him on April 10, 2014, and that she did not feel they could have occurred in December 2013 or January 2014, the time frame of the indictment, did not result in a material variance to the indictment.

Additionally, there is no material or prejudicial variance in the indictment because the State in this case made an election as to the specific incidents in the indictment, and the trial court instructed the jury as to the State's election. The victim was interviewed by Nicole Mullinax on February 5, 2014, and the victim told her that the offenses occurred over Christmas break, which would have been during the time frame listed in the indictment. The victim said that during this time, Defendant licked his finger and placed it inside the victim's bottom. He said that the Defendant then placed his "privates" in the victim's bottom pushing it "all the way in and all the way out." The victim told Ms. Mullinax that Defendant also placed his "privates" in the victim's mouth. This proof substantially corresponded to the indictment and the State's election of offenses. "A variance is not material when substantial correspondence exists between the proof and the indictment." *State v. Osborne*, 251 S.W.3d 1, 15 (Tenn. Crim. App. 2007). This Court has also stated that, "[w]hen the indictment and the proof substantially correspond, the Defendant is not misled or surprised at trial, and there is protection against a second prosecution for the same offense, the variance is not considered material." *Id.* Defendant is not entitled to relief on this issue.

## V. Whether the Trial Court Properly Sentenced Defendant

Defendant contends that the trial court departed from the purposes and principles of the Sentencing Act in imposing his sentences. Specifically, Defendant asserts that the trial court misapplied various enhancement factors and failed to apply mitigating factors in reaching its decision.

Our standard of review of the trial court's sentencing determinations is whether the trial court abused its discretion, and we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the

sentence was improper. T.C.A. § 40-35-401 (2017), *Sentencing Comm'n Cmts*. In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2017).

Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

We conclude that the trial court properly sentenced Defendant. Defendant's three convictions for rape of a child are Class A felonies. T.C.A. § 39-13-522(b)(1). Because he was convicted of rape of a child, Defendant was subject to a sentencing range of twenty-five to forty years as a Range II offender. T.C.A. § 39-13-522(2)(A); § 40-35-112(b)(1). Defendant's sentence of thirty years for each count of rape of a child is within the range. Defendant was classified by the trial court as a Range II offender for his conviction of incest, a Class C felony. T.C.A. § 39-15-302 (a)(1), (b). He was subject to a sentencing range of six to ten years. T.C.A. 40-35-112 (b)(3). Defendant's sentence of eight years for incest is within the range. The trial court ordered two of the counts of rape of a child to be served consecutively to each other and concurrently to the remaining counts for an effective sixty-year sentence. Defendant does not challenge the imposition of consecutive sentencing.

The record reflects that the trial court considered four statutory enhancement factors in determining Defendant's sentences: (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (4), that the victim was particularly vulnerable because of his age or physical or mental disability; (7), that "[t]he offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement"; and (14),

- 20 -

that the defendant abused a position of private trust.  T. C. A. § 40-35-114(1), (4), (7), (14).

Defendant does not challenge the application of enhancement factor (1), and the record reflects that it was appropriately applied.  The record also supports consideration of two of the three enhancement factors that Defendant challenges.

Relevant to enhancement factor (4), that the victim was particularly vulnerable because of his age or physical or mental disability, the trial court found:

> The victim was particularly vulnerable not merely because of his age but because he was dependent and neglected by his father, the defendant, and when DCS placed the victim in the care and custody of [Wilma Sue Strange] and her husband (defendant's [sic] parents and victim's grandparents) it was ordered that the defendant have no contact with the victim.  In fact, in return for opioids, Ms. Strange allowed the defendant to be around the victim and even had the defendant drive the victim to his appointments at Helen Ross McNabb.  All of these circumstances taken together resulted in the victim's vulnerability being greater than which resulted from age alone.  It strikes the court that the qualification of vulnerability is not an exact science but the argument has been made and the court will consider it.

We find that the record does not support the trial court's application of this factor.  This factor "relates more to the natural physical and mental limitations of the victim than merely to the victim's age." *State v. Adams,* 864 S.W.2d 31, 35 (Tenn.1993).  In other words, "[t]he factor can be used in [a child sexual abuse] case if the circumstances show that the victim, because of his [or her] age or physical or mental condition, was in fact 'particularly vulnerable,' i.e., incapable of resisting, summoning help, or testifying against the perpetrator." *Id.*  The facts relied upon by the trial court, while they show despicable conduct by both Defendant and by Wilma Sue Strange, they do not pertain to the victim's age, or physical or mental condition.  Therefore, the trial court should not have applied this enhancement factor.  However, misapplication of an enhancement factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Bise*, 380 S.W.3d at 708.

As to enhancement factor (7), that the offense involved a victim and was committed to gratify Defendant's desire for pleasure or excitement, the record supports the trial court's application of this factor.  "Essential to proper application of this factor is the determination of the defendant's motive for committing the offense." *State v. Arnett*, 49 S.W.3d 250, 261 (Tenn. 2001).  "[F]actor (7) may be applied with evidence including, but not limited to, sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner,

or remarks or behavior demonstrating the defendant's enjoyment" of the crime. *Id.* at 262(citations omitted). In this case, Defendant engaged in a series of progressive sexual acts with the victim by penetrating the victim's anus with his finger, penetrating the victim's anus with his penis while licking the victim's ear, and placing his penis in the victim's mouth. Defendant also said, "Did you know I'm doing sex to you?" The record supports application of this factor.

Finally, as to enhancement factor (14), that the defendant abused a position of private trust, it is undisputed that Defendant was the victim's natural father, and the offenses occurred while they were living in the same household. The Tennessee Supreme Court has said: "The position of parent, step-parent, babysitter, teacher, coach, are but a few obvious examples" of a position of public or private trust. *State v. Gutierrez*, 5 S.W.3d 641, 645 (Tenn. 1999). An adult "occupies a position of 'presumptive private trust' with respect to the minor" when the adult and child are members of the same household. *Id.*; *See also State v. Grady Alton Vest*, No. W2018-01694-CCA-R3-CD, 2019 WL 7288803, at *6 (Tenn. Crim. App. Dec. 30, 2019) (The "position of trust" enhancement factor is applicable in cases of incest). Therefore, the trial court properly applied this factor.

Defendant also contends that the trial court failed to consider "evidence presented in the record that [he] was actually a victim of incest himself and suffered from mental and intellectual disabilities" in mitigating his sentence. T.C.A. § 40-35-113(8), (13). However, the trial court's written order specifically states: "In mitigation the defense argues that the defendant suffers from disability and development disorders, has an I.Q. of 62 and was abused by his mother. The argument is that all these factors taken together cause the defendant to be close to mentally incompetent." Therefore, it appears that the trial court considered this evidence. We note that there was no evidence presented at the sentencing hearing to show that Defendant was a victim of incest. It was noted that Defendant was physically abused by his mother.

We conclude that the trial court properly sentenced Defendant. The trial court considered the relevant principles and sentenced Defendant to a within-range sentence for each conviction. As such, Defendant is not entitled to relief.

## CONCLUSION

Based upon the foregoing analysis, the judgments of the trial court are affirmed.

_____

THOMAS T. WOODALL, JUDGE